IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| DEBRA MOSER and : | |
| CHRISTIE MOSER, : | |
| : | |
| Plaintiffs, : | CIVIL ACTION |
| v. : | |
| : | NO. 10-2003 |
| : | |
| THE PENNSYLVANIA SOCIETY FOR : | |
| THE PREVENTION OF CRUELTY TO : | |
| ANIMALS et al, : | |
| : | |
| Defendants. | |

### MEMORANDUM OPINION

Tucker, J.                                                                                   October ___, 2012

      Presently before the Court is Defendants' Motion for Summary Judgment Pursuant to Fed. R. Civ. P. 56 (Docs. 13 &16) and Plaintiffs' Response in Opposition thereto (Doc. 15). Upon consideration of the parties' motions with briefs and exhibits, and for the reasons set forth below, Defendants' motion will be *granted*.

### I. FACTUAL BACKGROUND[1]

    Plaintiffs Debra Moser and Christie Moser bring this action against defendants the Pennsylvania Society for the Prevention of Cruelty to Animals ("PSPCA") and three of its employees, Ashley Mutch ("Mutch"), Kristen Sullivan ("Sullivan"), and Wayne Smith ("Smith"), in their official and individual capacities, for alleged civil rights violations under 42 U.S.C. § 1983, the Fourth and Fourteenth Amendments to the United States Constitution, and 18

---

[1] The general facts, unless otherwise noted, are taken from the statements of material undisputed and disputed facts submitted by the parties. (Docs. 23 & 24).

1

Pa.C.S. § 5511(l).  Plaintiffs contend that the defendants violated § 1983 by unconstitutionally searching their rented farm; seizing their property; failing to properly train Mutch, Sullivan, and Smith; and denying them their procedural due process rights under Pennsylvania law.  Plaintiffs also assert that the defendants committed the tort of conversion by depriving them of their property, and that they are entitled to a declaratory judgment that defendants unconstitutionally searched and seized their property.

Plaintiffs, a mother and daughter, own and rehabilitate animals on a rented, 18 acre farm in Northampton County, Pennsylvania.  The PSPCA, a Pennsylvania non-profit corporation, is empowered to enforce Pennsylvania laws pertaining to prevention of cruelty to animals through its humane society police officers.[2]  Mutch, Sullivan, and Smith are employed by the PSPCA as such officers.

The property in question consists of barns, outbuildings, and pastures.  The Mosers rented part of the property pursuant to an oral lease with the property's owner.  Neither Debra Moser nor Christie Moser lives at the rented property; rather, Debra Moser lives in Kunkletown, Pennsylvania and Christie Moser lives in Bethlehem, Pennsylvania.  The Mosers shared the rented farm with April Lambert and Darren Honeywell, individuals renting a farmhouse and barn located at the entrance of the property.  Lambert and Honeywell had separate rental agreements with the property owner.  Debra Moser suffers from a history of depression and fibromyalgia, and has been on Social Security Disability as a result for the last eight to ten years.  While her fibromyalgia causes her daily pain, Debra Moser nonetheless cared for the animals herself.

---

[2] Under 18 Pa. Cons. State. § 5511(i), "[a]n agent of any society or association for the prevention of cruelty to animals, incorporated under the laws of the Commonwealth, shall have the same powers to initiate criminal proceedings provided for police officers by the Pennsylvania Rules of Criminal Procedure. An agent of any society or association for the prevention of cruelty to animals, incorporated under the laws of this Commonwealth, shall have standing to request any court of competent jurisdiction to enjoin any violation of this section." 18 Pa. Cons. Stat. § 5511.

According to Debra Moser, she cared for her animals twice a day. (Debra Moser Dep. at 16). Christie Moser's involvement was mostly in the form of financial support given to her mother. Debra Moser, with financial assistance from Christie Moser, purchased most of her horses from Michael Frantz.[3] The majority of the horses were aged and unhealthy at the time they were purchased. The Mosers bought these horses from Frantz in order to save them from going to slaughter. Two horses in particular, a white mare and a brown mare, are the subjects of this litigation.

On November 11, 2008, Debra Moser's acquaintance, Shana McGovern, made a complaint to the Lehigh Township Police Department regarding the inadequate care she believed Debra Moser's animals were receiving. McGovern reported that "Debra's intentions are good, however [Debra] is unable to care for the horses and other animals on the farm due to time and financial constraints." (Doc. 17, Ex. E: Lehigh Township Police Department report). In response, Officers Mutch and Sullivan visited the property on November 14, 2008. When the officers did not find anyone at the property, Mutch left her business card and a written request that someone contact her. On December 12, 2008, Mutch made a follow-up visit to the property and again found no one there. Mutch again left her business card.[4]

---

[3] Frantz is a self-described "horse dealer" with a questionable reputation. Frantz attends auctions and buys horses both in good and poor condition. (Frantz Dep. at 11). Frantz states the following: "Let's put it this way, I kept the best and sold the rest." (Id. at 12). Frantz has purchased animals at the auction and then immediately sold them to a butcher; he has also sold some such animals to Debra Moser, estimating 30 horses and ponies over the years. (Id. at 14-16). According to McGovern, the "biggest contributing factor" in Debra Moser taking in so many animals "was Michael Frantz. He has a petting zoo of kind of as people say of ill repute, not a very nice place, and he would tell Deb that he was going to send this animal to the auction if she didn't take it. And specifically he had a contact that had lions and big cats, and if she didn't want to take the animal it would either go to the slaughter house or to the friends with the cats, who would eat the animals." (McGovern Dep. at 25).

[4] It appears that the business cards left by Mutch may have been left on the door of the farmhouse occupied by Lambert and Honeywell. Lambert, when she spoke to Mutch on December 17, 2008, stated that she recalled receiving at least one the business cards. (Mutch Dep. at 23). Therefore, it is likely that Debra Moser never received one of Mutch's cards, and therefore had no reason to know that the PSPCA was trying to get in contact with her. Debra Moser believes she first had contact with the PSPCA on December 17, 2008, when she received a message from Officer Mutch and returned the call later that same day. (Debra Moser Dep. at 33).

The events in question transpired on December 17-18, 2008. Mutch and Sullivan again attempted to contact Debra Moser at the farm on December 17, 2008. At this time, Mutch and Sullivan met Lambert.[5] Lambert asked Mutch and Sullivan whether she could voluntarily surrender two of her own horses, whom she could no longer afford to care for. Lambert explained that she and Debra Moser rented the entire property, and would swap out where their particular animals were on any given day. (Mutch Dep. at 21).[6] Lambert informed Mutch and Sullivan that Debra Moser could not consistently care for her own animals and that it would sometimes be three days to a week between Moser's visits to the farm. (Id. at 22). Lambert expressed concern that Debra Moser was away from the property for long periods of time, leaving Lambert to care for Moser's animals in addition to her own. Lambert also proceeded to give Mutch and Sullivan a tour of the property, pointing out which animals belonged to Debra Moser. It is undisputed that Mutch and Sullivan did not have a warrant to search the property, nor did they have Debra Moser's consent.

Based on the information received from Lambert, Mutch estimated that twenty-one animals belonged to Debra Moser. (Id. at 30). It was during the tour of the farm that Mutch and Sullivan were able to see the brown mare up close. The brown mare was extremely thin and had a dip in its back. (Id. at 35). The animal was soaked with water, and temperatures were cold. In addition, the brown mare had urine and feces mixed in with its hay, which the animal was trying

---

[5] Lambert has not been deposed in this matter. The Court notes, at the outset, that the statements attributed to Lambert by Mutch and Sullivan are hearsay. However, the Plaintiffs have not challenged the admissibility of these alleged statements or argued that they are not credible. Plaintiffs *have* disputed the idea that Lambert was present when the search and seizure took place. (Doc. 24 at 13). However, Plaintiffs have offered absolutely no proof to support their contention that Lambert was not present.

[6] According to Mutch, Lambert also described herself as a "renter with Debbie." (Id.). Debra Moser testified that she rented the "upper barn," "a small milk house," and a shed on the property. (Debra Moser Dep. at 13). Debra Moser further testified that, while there was no written lease, she has a drawing from the property owner designating which part of the property was hers. (Id. at 12-14). In addition, Debra Moser testified that only the lower barn, fields, and farmhouse were rented by Lambert and Honeywell. (Id. at 19). Conversely, Christie Moser testified that there was no clear demarcation of who rented which part(s) of the property. (Christie Moser Dep. at 5-7).

to eat. (Id.). In addition, the horse's right front leg was deformed and looked visibly painful to Officer Mutch. (Id. at 35).  Lambert led Mutch around the barn, where Mutch also observed a rabbit, which had no food, no water, and inadequate shelter, along with feces, throughout its cage. (Id. at 37). There were also five ponies present with no food or shelter. (Id. at 37). While there was water in one container, given cold temperatures, the water was partially frozen. (Id. at 39).  Mutch then observed the white mare (Id. at 40). The animal was stumbling and "all ribs" (meaning she was thin and emaciated). (Id. at 40). April Lambert reportedly told Mutch that the animal had been losing weight. (Id. at 43).

     Lambert provided the officers with Debra Moser's telephone number.  Mutch and Sullivan made repeated attempts to reach Debra Moser throughout the day, attempting to get her side of the story regarding the animals. (Id. at 27-28).  The officers ultimately tried four to six different telephone numbers for Moser.  Mutch and Sullivan also called several local vets in an attempt to determine whether the animals had received care recently.  However, none of the vets contacted had information on Debra Moser or her animals. (Id. at 26; see also Doc. 17, Ex. D: printout of map with hand written notations of veterinarians contacted).

     At some point, Mutch contacted her supervisor, George Bengal, asking him to send a trailer for the horses that Lambert was going to surrender. (Id. at 31).  After observing the condition of the white mare, Mutch called Bengal again, and informed him that she did not believe the animal would survive the night. (Id. at 43).  Bengal gave Mutch approval to seize the white mare.  At some point, Michael Frantz arrived at the property; Frantz informed Mutch that he sold horses for slaughter, but that Debra Moser would buy some of those horses from him. (Id. at 50). He claimed that Debra Moser was a "nice lady" who had too much on her hands, and provided Mutch with the same phone number that April Lambert already had. (Id. at 50-51).

Officer Smith then arrived with the horse trailer.  Smith assisted Mutch and Sullivan in cutting the lock and chain on the gate to the pasture where the white mare was kept.  The officers then removed the white mare, and loaded her onto the trailer with the two horses surrendered by Lambert.  Afterward, Mutch stapled a notice on Debra Moser's barn stating "WARNING of violation of animal cruelty laws."(Compl. ¶¶ 24-26, 29; <u>see</u> <u>also</u> Doc. 17, Unmarked Exhibit: photographs taken by PSPCA on December 17, 2008).  Smith then left with the white mare and the two horses surrendered by Lambert.

     Later that night, Debra Moser returned Mutch's phone calls; this call was overheard by Christie Moser.  Mutch arranged to meet with Debra Moser the next day.  On December 18, 2008, Debra Moser met with Mutch and Sullivan.  According to Moser, Mutch threatened her with prosecution for animal cruelty if she did not surrender her animals. (Debra Moser Dep. at 49).[7]  According to Moser, she involuntarily signed over the white mare, the brown mare, a sheep, and a goat in order to avoid prosecution.  According to Mutch, Moser agreed to surrender the brown mare, as she could not afford veterinary care for it. (Mutch Dep. at 67).  Mutch contends the other animals were surrendered in order to lighten Moser's physical and financial burden in caring for so many animals. (<u>Id.</u>). Officer Mutch states that she informed Debra Moser she understood how people could get overwhelmed, and that she was not going to cite Moser for animal cruelty. (<u>Id.</u> at 70-71).  Officers Mutch and Sullivan also stayed at the property that day for an additional four to five hours, rounding up Debra Moser's ponies for her, cleaning out the stalls, providing hay and water for the horses, and setting up a new shelter for the rabbit. (<u>Id.</u> at 74, 76).  Ultimately, the white mare was treated by the PSPCA's veterinarians and adopted.  The brown mare had to be euthanized due to its leg injury.

---

[7] Christie Moser also testified that Mutch threatened her mother with prosecution during the phone call the previous night. (Christie Moser Dep. at 19).

## II. STANDARD OF REVIEW

Summary judgment is appropriate where the moving party establishes that "there is no genuine issue as to any material fact and that [it] is entitled to a judgment as a matter of law." Fed R. Civ P. 56(c). See Levy v. Sterling Holding Co., LLC, 544 F.3d 493, 501 (3d Cir. 2008). A factual dispute between the parties will not defeat a motion for summary judgment unless it is both genuine and material. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986); Dee v. Borough of Dunmore, 549 F.3d 225, 229 (3d Cir. 2008). A factual dispute is genuine if a reasonable jury could return a verdict for the non-movant, and it is material if, under the substantive law, it would affect the outcome of the suit. See Anderson, 477 U.S. at 248; Fakete v. Aetna, Inc., 308 F.3d 335, 337 (3d Cir. 2002).

The moving party must show that if the evidentiary material of record were reduced to admissible evidence in court, it would be insufficient to permit the non-moving party to carry its burden of proof. See Celotex v. Catrett, 477 U.S. 317, 327 (1986). Once the moving party has carried its burden under Rule 56, "its' opponent must do more than simply show that there is some metaphysical doubt as to the material facts." Scott v. Harris, 550 U.S. 372, 380 (2007). Under Fed. R. Civ. P. 56(e), the opposing party must set forth specific facts showing a genuine issue for trial and may not rest upon the mere allegations or denials of its pleadings. See Martin v. Godwin, 499 F.3d 290, 295 (3d Cir. 2007).

At the summary judgment stage the court's function is not to weigh the evidence and determine the truth of the matter, but rather to determine whether there is a genuine issue for trial. See Anderson, 477 U.S. at 249; Jiminez v. All American Rathskeller, Inc., 503 F.3d 247, 253 (3d Cir. 2007). In doing so, the court must construe the facts and inferences in the light

most favorable to the non-moving party. See Horsehead Indus., Inc. v. Paramount Communications, Inc., 258 F.3d 132 (3d Cir. 2001). The court must award summary judgment on all claims unless the non-moving party shows through affidavits or admissible evidence that an issue of material fact remains. See, e.g., Love v. Rancocas Hosp., 270 F.Supp.2d 576, 579 (D.N.J. 2003); Koch Materials Co. v. Shore Slurry Seal, Inc., 205 F.Supp.2d 324, 330 (D.N.J. 2002).

### III. DISCUSSION

**A. Declaratory Judgment (Count I)**

In Count I of the Complaint, Plaintiffs seeks a declaratory judgment that Defendants unconstitutionally searched and seized their property. However, as counsel for the Defendants rightly points out, counsel for the Plaintiffs have previously made an identical pleading before Judge Dalzell in Kauffman v. Pennsylvania Soc. for the Prevention of Cruelty to Animals, 766 F. Supp. 2d 555 (E.D. Pa. 2011). Judge Dalzell held:

> As a prefatory matter, we note that while Fed.R.Civ.P. 8(a)(3) provides that "[a] pleading that states a claim for relief must contain ... a demand for the relief sought, which may include relief in the alternative or different types of relief," "the pleader need only make one demand for relief regardless of the number of claims that are asserted." 5 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1255 (3d ed.2008). **The relief a plaintiff seeks, and the claims he asserts, are thus conceptually distinct components of a complaint, and there is no need for a plaintiff to devote a separate count of a complaint to a request for a certain type of relief, as [Plaintiff] does in seeking a declaratory judgment under Count I.** Such belt-and-suspenders pleading is particularly inapt when the plaintiff includes an application for the claimed relief in his concluding prayer for relief, as [Plaintiff] does here….We will thus dismiss Count I of the complaint as redundant and not in conformity with Rule 8(a)(3).

Id. at 560 (emphasis added). The Court agrees with this reasoning. Here, as in Kauffman, Count I is redundant when considered in conjunction with Plaintiffs' prayer for relief that "this honorable Court declare that the actions of defendants to be in violation of the Fourth

and Fourteenth Amendments to the United States." (Compl. at 16).  Further, if a jury were to find in Plaintiffs' favor on Counts II and III, this would necessarily entail a declaration that Defendants unconstitutionally searched and seized Plaintiffs' property.  Count I, therefore, is unnecessary in vindicating the rights the Mosers are asserting.  Accordingly, Count I is dismissed with prejudice.

   B. **Unconstitutional Search and Seizure (Count II)**

   The Fourth Amendment provides:

   The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

   U.S. Const. amend. IV. Count II of the Complaint alleges that Defendants Mutch, Sullivan, and Smith unconstitutionally searched Plaintiffs' property without a warrant, in violation of 18 Pa. C.S. §5551(l)[8] and 22 Pa. C.S. § 3701 et seq.[9]  In addition, Plaintiffs' allege that Mutch, Sullivan, and Smith seized property without a warrant and refused to return the property even after the Mosers demanded that they do so.  Mutch is also alleged to have threatened and intimidated Debra Moser into turning additional animals over the PSPCA.

   The Fourth Amendment prefers, but does not require, that the police conduct searches

---

[8] Under 18 Pa. Cons. Stat. § 5511(l), "[w]here a violation of this section is alleged, any issuing authority may, in compliance with the applicable provisions of the Pennsylvania Rules of Criminal Procedure, issue to any police officer or any agent of any society or association for the prevention of cruelty to animals duly incorporated under the laws of this Commonwealth a search warrant authorizing the search of any building or any enclosure in which any violation of this section is occurring or has occurred, and authorizing the seizure of evidence of the violation including, but not limited to, the animals which were the subject of the violation." 18 Pa. Cons. Stat. Ann. § 5511.

[9] The Complaint actually states that Defendants violated 22 Pa. C.S. § 3719, a provision which does not exist.  The Court assumes that Plaintiffs intended to allege violations of 22 Pa. C.S. § 3701 et seq., which pertains to the qualifications, appointment, and authority of humane society police officers.  With respect to searches and seizures conducted by humane society police officers, 22 Pa. Cons. Stat. § 3710 provides: "Notwithstanding contrary provisions of 18 Pa.C.S. § 5511(1) (relating to cruelty to animals) and in addition to the requirements of existing law, all search warrant applications filed in connection with alleged violations of cruelty to animals laws must have the approval of the district attorney in the county of the alleged offense prior to filing." 22 Pa. Cons. Stat. § 3710.

and seizures pursuant to a warrant. See United States v. Leon, 468 U.S. 897, 914 (1984) ("[W]e have expressed a strong preference for warrants and declared that in a doubtful or marginal case a search under a warrant may be sustainable where without one it would fall.") (internal citations omitted). Indeed, neither 18 Pa. Cons. Stat. § 5511(l) nor 22 Pa. C.S. § 3701 et seq. expressly requires that humane society officers obtain a warrant before conducting a search. In this way, Pennsylvania law treats humane society officers no differently than regular police officers. Here, it is undisputed that Mutch, Sullivan, and Smith did not have a warrant to search the Mosers' farm or to seize the white mare. Thus, any analysis of the Mosers' Fourth Amendment claim turns on whether a recognized exception to the warrant requirement has been met. See Brigham City v. Stuart, 547 U.S. 398, 403 (2006) ("[B]ecause the ultimate touchstone of the Fourth Amendment is 'reasonableness,' the warrant requirement is subject to certain exceptions." (internal citation omitted); see also Kentucky v. King, 131 S. Ct. 1849, 1858 (2011) ("[W]arrantless searches are allowed when the circumstances make it reasonable, within the meaning of the Fourth Amendment, to dispense with the warrant requirement.")

One such exception, relied on here by Mutch, Sullivan, and Smith, is the existence of probable cause and exigent circumstances.[10] Warrantless searches and seizures inside someone's

---

[10] Neither side fully addresses the question of whether Lambert was able to provide consent for Mutch and Sullivan to search the property. Lambert has not been deposed in this matter and, as previously stated, the Mosers did not have written lease, which would have more clearly delineated which part of the property was exclusively theirs. Because the factual record is undeveloped on this point, the Court will not consider whether the consent exception to the warrant requirement has been met.

In addition, neither side addresses the question of whether at least part of this property should be considered open fields and not curtilage. This is notable considering that the white mare was found in an open pasture, whereas the brown mare was found inside a barn. Curtilage, unlike open fields, is entitled to Fourth Amendment protection. See e.g. United States v. Dunn, 480 U.S. 294, 307-08, (1987) ("State and federal courts have long recognized that a barn, like many other outbuildings, is a domestic building constituting an integral part of that group of structures making up the farm home….Consequently, the general rule is that the curtilage includes all outbuildings used in connection with a residence, such as garages, sheds, [and] *barns*...connected with and in close vicinity of the residence.") (internal citation omitted; emphasis in original); see also id. at 300 (listing four factors for determining the extent of the curtilage). Both sides appear to assume that the entire area searched is curtilage and therefore part of the home. If this area is part of the home, then this necessitates the existence of both probable cause and exigent circumstances in order for this search and seizure to be deemed constitutionally permissible. Because the parties have not

home are presumptively unreasonable unless the occupants consent or probable cause *and* exigent circumstances exist to justify the intrusion. Steagald v. United States, 451 U.S. 204, 211 (1981); Payton v. New York, 445 U.S. 573, 586 (1980); United States v. Coles, 437 F.3d 361, 365-66 (3d Cir. 2006); United States v. Rubin, 474 F.2d 262, 268 (3d Cir.1973) ("Probable cause to believe contraband is present is necessary to justify a warrantless search, but it alone is not sufficient…. Mere probable cause does not provide the exigent circumstances necessary to justify a search without a warrant."). Probable cause itself has no single, fixed definition. Illinois v. Gates, 462 U.S. 213, 232, 103 S. Ct. 2317, 2329, 76 L. Ed. 2d 527 (1983) ("[P]robable cause is a fluid concept-turning on the assessment of probabilities in particular factual contexts-not readily, or even usefully, reduced to a neat set of legal rules."). However, "[t]he substance of all the definitions' of probable cause is a reasonable ground for belief of guilt…. [I]t has come to mean more than bare suspicion: Probable cause exists where the facts and circumstances within [the officer's] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed." Brinegar v. United States, 338 U.S. 160, 175-76 (1949) (internal citations omitted). One exigency obviating the requirement of a warrant is the need to assist persons (or, in this case, animals) who are seriously injured or threatened with such injury. "The need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency." Mincey v. Arizona, 437 U.S. 385, 393-394

---

addressed this distinction and the factual record is unclear on this point, the Court will assume but not decide that both probable cause and exigency were required.

(1978) (internal citation omitted); see also Brigham City v. Stuart, 547 U.S. 398, 403-04 (2006). Accordingly, law enforcement officers may enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury.

It is well-established that, in the Third Circuit, "the existence of probable cause in a section 1983 action is a question of fact." Wilson v. Russo, 212 F.3d 781, 796 (3d Cir. 2000) (quoting Sherwood v. Mulvihill, 113 F.3d 396, 401 (3d Cir.1997)); see also Montgomery v. De Simone, 159 F.3d 120, 124 (3d Cir. 1998); Groman v. Township of Manalapan, 47 F.3d 628, 635 (3d Cir.1995); Deary v. Three Un-Named Police Officers, 746 F.2d 185 (3d Cir.1984); Patzig v. O'Neil, 577 F.2d 841 (1978). Therefore, summary judgment on the Mosers' search and seizure claims is only appropriate if, taking all of the Mosers' allegations as true and resolving all inferences in their favor, a reasonable jury could not find a lack of probable cause for the search and seizure. See Sherwood v. Mulvihill, 113 F.3d at 400–01 ("The district court may conclude in the appropriate case, however, that probable cause did exist as a matter of law if the evidence, viewed most favorably to Plaintiff, reasonably would not support a contrary factual finding."); Deary v. Three Un-Named Police Officers, 746 F.2d at 192 ("We do not hold that every civil case involving an issue of probable cause must be tried to a jury and cannot be resolved on summary judgment….To the contrary, where no genuine issue as to any material fact exists and where credibility conflicts are absent, summary judgment may be appropriate.") Accordingly, the Court must examine the evidence presented by the parties on probable cause and, applying any appropriate presumptions, determine whether the Mosers have raised a genuine issue of material fact as to whether the defendants had probable cause for the search and seizure.

The Court finds that there is no genuine issue of material fact. The Court will assume that Debra Moser never received the business cards Mutch left at the farm on November 14,

2008 and December 12, 2008, and therefore had no reason to know that the PSPCA was concerned about the care of her animals and was attempting to contact her. Nonetheless, the unfolding of events on December 17, 2008 were enough to establish probable cause for both the search of the property and the seizure of the white mare. When the officers arrived at the farm on December 17, they were greeted by Lambert. Lambert's comments to the officers echoed the same concerns previously voiced by McGovern when she made the initial complaint. The officers were also able to lawfully observe certain questionable conditions on the property from the driveway. These factors created probable cause for the warrantless search of the farm.

Once the lawful search was commenced, Mutch and Sullivan were able to closely observe the condition of the brown mare and the white mare. The photographs taken by Mutch and Sullivan as they searched the property on December 17 fully substantiate Mutch's claim that exigent circumstances existed for seizing the white mare.[11] Mutch was able to clearly articulate the factors she believed contributed to exigency. Mutch testified at her deposition: "I told [Bengal], based on the weather, the condition of the horse that I had just seen, the way that it was walking and being unable to contact anybody about this horse, that I didn't feel that this horse was necessarily going to make it through the night alive." (Mutch Dep. at 43). Further, Mutch informed Bengal she was concerned because "there was no contact to be made with anybody that owned this horse. There was just the factors of the no food, frozen water, no shelter. It was getting colder as the day was…ending." (Id.). Mutch was also concerned that the white mare

---

[11] Mutch testified she understood exigency to mean the following: "Exigent meant a circumstance where it's life or death for this animal. It's not, okay, it's in pain, it can wait until tomorrow even though [the animal] is hurting. This was, I don't think this animal is going to make it through the night. You know, and that's when I said -- I'm pretty sure I had [Sullivan] try to call the numbers again because I needed some sort of answer before I removed this animal, you know, and try to resolve it, see if [Debra Moser] knew anything or could come over if she didn't realize the horse was in this condition. But I got nothing from those phone calls." (Mutch Dep. at 46). Sullivan testified she understood exigency to mean that "if we didn't intervene at this point in time, there is a chance that the animal would die by the time we could remove it." (Sullivan Dep. at 19).

"seemed to be weak" and was "acting definitely like something was wrong with it." (Id.).

Under the circumstances, the Court does not think Mutch's assessment of the situation was unreasonable. Sullivan and Smith also agreed with Mutch's determination that exigency existed, for the same reasons articulated by Mutch.[12] The Court also finds significant the fact that Mutch made numerous attempts to contact Moser (and local veterinarians) before she made the decision to seize the white mare. It is clear that seizing the white mare was only a last resort after Debra Moser could not be reached during the several hours that the officers were at the property. Further, seizing the white mare was all the more reasonable given Lambert's statements that Debra Moser was inconsistent in coming to the property and caring for her animals. It was therefore reasonable for Mutch to believe that it could be several days before Moser returned to the property. In addition, the Court notes Mutch, Sullivan, and Smith did not seize the brown mare on December 17 even though they were also concerned about its condition. This is because Mutch reasonably recognized that, while exigent circumstances justified seizing the white mare, exigent circumstances did not justify seizing the brown mare.[13]

The Court also does not find credible the Mosers' claim that Mutch "threatened" Debra Moser with prosecution if she did not surrender other animals. Merely making Debra Moser aware that she could be prosecuted for animal cruelty does not amount to a threat. Nearly every witness (besides the Mosers) has testified that Debra Moser was overwhelmed by having to care

---

[12] Sullivan testified that she had "[n]o immediate concern" for the other horses. (Sullivan Dep. at 30). Sullivan further stated: " [T]he conditions weren't ideal for any of the horses because they didn't have shelter and they didn't have food and they didn't have water. But their body condition was good." (Id.). Smith testified that because the "body weight [of the brown horse] wasn't as bad as the white horse, [he] didn't feel that concerned about that horse. More so the white horse." (Smith Dep. at 18).

[13] Lambert also informed the officers, as she led them around the property, that she believed the white mare was in the "worst condition." (Sullvan Dep. at 18).

for so many animals.[14]  Under the circumstances, it was reasonable to Mutch to encourage Moser to surrender some of the animals in order to lighten her burden.  The Court does not doubt that Debra Moser was compassionate and well-intentioned individual.  No one who has testified in this case—the PSPCA officers, McGovern (the person who made the complaint to the police that ultimately led to the events in question), nor Frantz (the person who sold these damaged horses to Moser in the first place)—has questioned Debra Moser's intentions.  Indeed, it is likely because Moser was so well-intentioned that she was ultimately not charged with animal cruelty.  However, Moser's good intentions are quite beside the point.  Accordingly, Count II is dismissed with prejudice.[15]

### C. Procedural Due Process (Count III)

The Fourteenth Amendment provides, in relevant part: "[n]o state shall … deprive any person of …property, without due process of law." U.S. Const. amend. XIV. Under 18 Pa. Cons. Stat. § 5511(i), humane society officers function as state actors.  The Mosers claim that Mutch, Sullivan, and Smith took their property without any pre-deprivation or post-deprivation hearing.  Further, the Mosers contend the Defendants have refused to return their property or to

---

[14] See e.g. McGovern Dep. at 8 ("[Debra] had quite a few animals and she didn't always feel like she could take care of them, it was too many…."); Sullivan Dep. at 28 (stating that, at the December 18, 2008 meeting, Debra Moser described herself as "overwhelmed" and admitted she "took on too many animals").

[15] The Mosers have also advanced a secondary argument that Smith and Sullivan violated their constitutional rights in participating in the search and seizure because they may not have been sworn in Northampton County on December 17, 2008.  Neither Smith, Sullivan, nor George Bengal could conclusively state whether Smith and Sullivan were sworn in in Northampton on this date.  It is uncontroverted that Mutch was sworn in in Northampton on December 17, 2008.  Pennsylvania law limits the authority of humane society officers to their county of appointment. 22 Pa.C.S. § 3708 (a).  However, Defendants correctly point out that the mere fact that Smith and Sullivan may not have been sworn in at the relevant time does not create a per se violation of the federal Constitution.  See Willard v. Pennsylvania Soc. for the Prevention of Cruelty to Animals, CIV.A. 11-04543, 2012 WL 1392657 fn. 6 (E.D. Pa. Apr. 23, 2012) ("If [Plaintiff] believes that any violation of state regulations governing the PSPCA is a per se violation of her Fourth Amendment rights, she is mistaken.… It is well understood ... that '[m]ere violation of a state statute does not infringe the federal Constitution.'") (quoting Archie v. City of Racine, 847 F.2d 1211, 1216–17 (7th Cir.1988) (en banc)).

adequately compensate them for it.  The Mosers claim the Defendants "utterly failed to comply with the provisions of Title 22 of the Pennsylvania Consolidated Statutes, Chapter 37, which provides the procedural requirements prior to seizure of private property by the PSPCA." (Compl. ¶¶ 55, 57).  The Mosers make no reference to any specific provision or provisions the Defendants have failed to comply with, nor how such violation contributed to alleged due process violations. However, "[i]n order to state a claim for failure to provide due process, a plaintiff must have taken advantage of the processes that are available to him or her, unless those processes are unavailable or patently inadequate." Kauffman, 766 F. Supp. at 571 (citing Alvin v. Suzuki, 227 F.3d 107, 116 (3d Cir.2000)); see also Willard v. Pennsylvania Soc. for the Prevention of Cruelty to Animals, CIV.A. 11-04543, 2012 WL 1392657 (E.D. Pa. Apr. 23, 2012) ("To maintain an action for intentional or negligent deprivation of property under § 1983, Plaintiff must show that: (1) Defendants acted under color of state law; and (2) Plaintiff has no adequate post-deprivation state remedy to redress the wrong." Marsh v. Ladd, No. 03–5977, 2004 U.S. Dist. LEXIS 22195, at *21–22, 2004 WL 2441088 (E.D.Pa. Oct. 27, 2004) (citing Hudson v. Palmer, 468 U.S. 517, 533 (1984))….This follows from the Supreme Court's statement that random, unauthorized deprivations of property by state officials, whether intentional or negligent, do not violate due process if there is an adequate state post-deprivation remedy.)

     Pa. R. Crim. P 588 states: "[a] person aggrieved by a search and seizure, whether or not executed pursuant to a warrant, may move for the return of the property on the ground that he or she is entitled to lawful possession thereof. Such motion shall be filed in the court of common pleas for the judicial district in which the property was seized."  Here, Debra Moser filed a "Petition for the Return of Property Seized by the Pennsylvania S.P.C.A." in the Court of

16

Common Pleas for Northampton County. (Doc. 17, Ex. M). However, on or about March 20, 2009, Moser withdrew this Petition "pending discussions with [the PSPCA] to amicably resolve this matter." (Doc. 17, Ex. N: Order of Judge. Edward G. Smith). Plaintiffs, in their brief in opposition to Defendants' motion for summary judgment, have failed to explain why the Petition was withdrawn or why they did not continue to pursue an action in the Court of Common Pleas after settlement discussions clearly broke down.[16] Thus, the Mosers have failed to avail themselves of the remedy provided by Rule 588, and have not argued that the procedure the rule establishes is "inadequate or unavailable in any way." Barber v. Pennsylvania Dept. Agric., CIV.A.9-1462, 2010 WL 1816791 at *4 (W.D. Pa. May 3, 2010). Further, as Judge Ambrose noted in Barber, several district courts have already determined that Pennsylvania has put into place adequate post-deprivation remedies. Id. (reviewing district court jurisprudence respecting Pa. R.Crim. P. 588).

A reasonable jury could find that the Mosers were aware of their due process rights and the presence of an adequate post-deprivation remedy available to them in state court, but nonetheless failed to follow through with the process that was available. As such, they cannot now bring a Fourteenth Amendment claim against the Defendants. Accordingly, Count III is dismissed with prejudice.

### D. Inadequate Training and Supervision (Count IV)

In Count IV, the Mosers allege failure to train and supervisory liability claims. In support of the failure to train claim, the Mosers presented the following evidence: the only documents related to any training produced by any defendant was a syllabus for a 2010 training that occurred almost two years after the incidents alleged in the Complaint; Officer Mutch's

---

[16] The Court notes that the instant civil action was not filed until May 25, 2012, more than a year after the action in the Court of Common Pleas was withdrawn.

testimony that the training she received on search and seizure was the "the bare minimum" and "not much to remember." (Mutch Dep. at 81); the PSPCA's testimony that there are no written procedures or policies with respect to searches and seizures. (PSPCA Dep. at 54); the PSPCA's testimony that there is no written procedure with respect to collecting and preserving evidence. (PSPCA Dep. at 58); and the fact that no PSPCA employees have ever been disciplined for incorrectly handling evidence or a search or a seizure. (PSPCA Dep. at 58). Further, the Mosers' supervisory liability claims primarily concern two acts: (1) Wayne Smith's act of cutting the lock, and (2) George Bengal's (the PSPCA's director of law enforcement) act of authorizing the seizure of the white mare.[17]

To recover under a failure to train theory, a plaintiff must demonstrate that: (1) the failure to train amounted to deliberate indifference to the rights of persons with whom the officer came in contact; and (2) the municipality's policy actually caused a constitutional injury. City of Canton v. Harris, 489 U.S. 378, 389-390 (1989). In Sample v. Diecks, 885 F.2d 1099 (3d Cir.1989), the Third Circuit extended the Supreme Court's holding in City of Canton beyond municipal entities to supervisory personnel. The Sample court held:

> [W]e are confident that, absent official immunity, the standard of individual liability for supervisory public officials will be found to be no less stringent than the standard of liability for the public entities that they serve. In either case, a "person" is not the "moving force [behind] the constitutional violation" of a subordinate, City of Canton, 109 S.Ct. at 1205, unless that "person"…has exhibited deliberate indifference to the plight of the person deprived.

Id. at, 1118 (internal citation omitted). Thus, to hold a supervisory official liable, a plaintiff must: "(1) identify with particularity what the supervisory official failed to do that demonstrates his deliberate indifference; and (2) demonstrate a close causal relationship between

---

[17] The Mosers have not named George Bengal as an individual defendant in this matter. However, Bengal testified at deposition as the corporate designee of the PSPCA.

the identified deficiency and the ultimate injury." Kis v. County of Schuylkill, 866 F. Supp. 1462, 1474 (E.D. Pa. 1994) (citing Sample, 885 F.2d at 1118 and City of Canton, 489 U.S. at 489). Further, it is well-settled that there is no respondeat superior liability in § 1983 actions. See e.g. Rizzo v. Goode, 423 U.S. 362, 377 (1976). "Generally, a claim against an employer of law enforcement personnel based solely on a theory of failure to train or supervise must fail if it is found that the police officers that the employer supervised had probable cause to arrest." Kis v. County of Schuylkill, 866 F. Supp. 1462, 1473 (E.D. Pa. 1994) (internal citation omitted).

Here, Pennsylvania law vests humane society officers—private individuals—with law enforcement capability. This authority is all the more notable when one considers that Pennsylvania law grants this authority without also imposing a warrant requirement. Given the amount of discretion with which humane society officers are vested, it is likely advisable that the PSPCA establish more robust Fourth Amendment training procedures than are currently in place. However, whatever deficiencies there may be in the PSPCA's training procedures, it cannot be said that those deficiencies led to a constitutional violation in this instance. The facts of this case simply do not support a failure to train or supervisory liability claim.

Accordingly, Count IV is dismissed with prejudice. Because the Court finds that there is neither a failure to train nor are Smith and Bengal subject to supervisory liability, the Court need not reach the question of whether the individual defendants are entitled to qualified immunity.

E. **Conversion (Count V)**

In Count V, the Mosers assert a claim against Defendants for the tort of conversion. Pennsylvania law defines conversion as "the deprivation of another's right of property in, or use or possession of, a chattel, without the owner's consent and without lawful justification." Shonberger v. Oswell, 365 Pa.Super. 481, 484, 530 A.2d 112, 114 (1987) (citing Stevenson v.

Economy Bank, 413 Pa. 442, 451, 197 A.2d 721, 726 (1964)).

A jury could find that the Mosers have not satisfied all the elements of a conversion claim.  The Mosers have established that they had actual, immediate, and legal right to the two horses and the horse blanket that was on the white mare.  However, the Mosers were not deprived of this right without the owner's consent and without lawful justification.  As previously stated, the Court does not find credible the Mosers' claim that Mutch "threatened" Debra Moser with prosecution if she did not surrender other animals.  Based on the condition the horses were in when purchased by the Mosers, the fact that their health did not improve after months in Debra Moser's care, and Debra Moser's self-professed difficulty in taking care of them, it was likely in the Debra Moser's best interests, and the interests of these animals, for her to surrender them to the PSPCA.  As such, a jury could find that Debra Moser did not act under duress when she surrendered her property.  Count V is accordingly dismissed.

## IV. CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment is granted on all counts.  An appropriate order follows.